Patricia Bingaman
65883 McKennon Lane
P.O. Box 509 (mailing)
Imbler, OR 97841
(541) 786-1402
rpbing48@gmail.com
Plaintiff, Self-Represented

Levi Bakke
501 C Avenue
La Grande, OR 97850
(971) 303-4982
levi@valorinvestigates.com
Plaintiff, Self-Represented

FILED 28 JUL '26 10:29 USDC-ORP

## UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### PENDLETON DIVISION

| | |
|---|---|
| PATRICIA BINGAMAN and LEVI BAKKE, | Case No. 2:26-cv-01568-HL |
| Plaintiffs, | COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983) |
| v. | DEMAND FOR JURY TRIAL |
| AARON LENOX, in his individual capacity; ERIN SMITH, in her individual capacity; TEMPIE BARTELL; NADINE'S NEST, LLC, d/b/a NADINE'S NEST ADULT FOSTER HOME; and MALLORY KENNEY, in her individual capacity, | |
| Defendants. | |

## I. JURISDICTION

1. This action arises under **42 U.S.C. § 1983**. This Court has subject-matter jurisdiction under **28 U.S.C. § 1331** (federal question) and **28 U.S.C. § 1343(a)(3)-(4)** (civil rights).

2. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over any related state-law claim later added, but no state-law claim is asserted at this time.

#117629

## II. VENUE

3. Venue is proper in this District under **28 U.S.C. § 1391(b)** because a substantial part of the events or omissions giving rise to the claims occurred in this District, in Union County, Oregon, and one or more defendants reside in this District.

4. Divisional venue lies in the **Pendleton Division** under LR 3-2 because Union County is assigned to that division and the predominant events occurred there.

## III. PARTIES

5. Plaintiff **Patricia ("Patty") Bingaman** is a resident of Imbler, Union County, Oregon, and is the wife of Russell H. Bingaman (now deceased). She sues in her own individual capacity for the deprivation of her own constitutional rights. She does not assert any claim belonging to Russell's estate.

6. Plaintiff **Levi Bakke** is a resident of La Grande, Union County, Oregon, and an investigative journalist. He sues in his own individual capacity, on his own claim only (Count III).

7. Defendant **Aaron Lenox** was at all relevant times a Supervisor with the Oregon Department of Human Services (ODHS), Aging and People with Disabilities (APD), in Union County. He is sued in his **individual capacity** for acts taken under color of state law.

8. Defendant **Erin Smith** was at all relevant times a Licensor with ODHS/APD. She is sued in her **individual capacity** for acts taken under color of state law. The record identifies her as "DHS Licensor Erin Smith," reporting to Supervisor Aaron Lenox.

9. Defendant **Tempie Bartell** is the operator of Nadine's Nest Adult Foster Home in Union County, Oregon, a private party who acted jointly with and at the direction and authorization of the state defendants.

10. Defendant **Nadine's Nest, LLC** (Oregon registry no. 124821398, Active) does business as Nadine's Nest Adult Foster Home, a licensed adult foster home in Union County, Oregon. It is a private entity that acted jointly with the state defendants.

11. Defendant **Mallory Kenney** is the Manager of the ODHS Public Records Unit. She is sued in her **individual capacity** for acts taken under color of state law with respect to Count III.

12. Shawn Bingaman and Austin Bingaman, Russell's sons and court-appointed co-guardians (Union County Circuit Court No. 23PR02271), are **not defendants**. Their recorded communications are pleaded below solely as evidence of the state authorization and of the named defendants' joint action.

## IV. STATEMENT OF FACTS

### A. Background: the guardianship and the earlier visitation restriction

13. Russell H. Bingaman (born in 1947) was placed under a contested Oregon guardianship in Union County Circuit Court No. 23PR02271. His sons were appointed co-guardians. Russell resided at Nadine's Nest Adult Foster Home, operated by Defendant Tempie Bartell.

14. On or about **2024-01-10**, an ODHS SOQ investigation record (Investigation #00294325, activity dated January 10, 2024, subject "SU - AV IBL") reflects a request to limit Plaintiff Patty's visitation, verbatim: **"AP1 is requesting approval of IBL to limit W1 to twice weekly visits with AV. W1 will only be able to visit when accompanied by one of W1's or representative. Visits will last no longer than 30 minutes."** (ODHS SOQ Investigation #00294325.)

15. An earlier attempt to restrict Patty's access, on or about **2023-10-31**, culminated in a law-enforcement removal of Patty from the facility. The ODHS Safety, Oversight and Quality (SOQ) Unit investigation report states verbatim: **"LEA told W1 [Patricia] h/she needed to leave**

because W1 was trespassing." (ODHS SOQ Unit investigation #00294325.) ["LEA" = law-enforcement agency; "W1" = Patricia, per the report's witness numbering.]

16. ODHS investigated that visitation restriction and, in the SOQ report, determined it was improper and would be removed. The report states verbatim: **"AP1 attempted to follow the IBL rules for limiting visitation and was not aware the IBL was in violation of the Individual Based Limitations rules,"** and **"The IBL will be removed and no restrictions on visitation will be initiated."** (ODHS SOQ investigation #00294325, p. 6 of 11.) [In the report's numbering, "AP1" = the facility operator and "W1" = Patricia.]

17. On or about **2024-03-15**, the parties executed a Settlement and Mutual Release Agreement (the "Family Agreement"), which provides at paragraph 2.1(b), verbatim: **"Patricia will continue to visit Protected Person in the same manner that she has historically visited him."** (Settlement and Mutual Release Agreement, Mar. 15, 2024, ¶ 2.1(b).) The same section provides that Patricia would receive monthly reports (¶ 2.1(a)) and that **"Patricia may bring Protected Person food/meals"** (¶ 2.1(c)).

**B. The lockout: June–July 2024**

18. On **2024-06-25**, Defendant Bartell emailed Defendant Erin Smith (ODHS APD Licensor) about a move-out notice, stating the family would **"go back to court to try to prevent Patty from visiting at all."** (Native DHS email production; Plaintiff's Exhibit 22 in 26CV11493.)

19. On **2024-07-02 at 1:55 PM**, co-guardian Shawn Bingaman emailed Defendant Lenox directly, subject line **"IBL,"** attaching a document titled **"IBL 070224.docx"** — a draft involuntary behavior limitation directed at Patty's visits. (Native email, production p. 138.) The co-guardians' conduct is pleaded as evidence of the channel between the guardians and ODHS, not as a basis for liability against them.

20. On or about **2024-07-05,** Patty was blocked from entering the facility and denied a visit with her husband. Plaintiffs plead this date on personal knowledge; the exclusion that began in early July continued without interruption through mid-August 2024 (¶ 26).

21. On **2024-07-10,** the state and private actors coordinated the lockout:

a. At **9:53 AM,** Bartell emailed Smith forwarding a guardian communication about restricting Patricia's access.

b. At **11:16 AM,** Smith forwarded that email to ODHS APD Supervisor Aaron Lenox and ODHS investigator James ("Cody") Yeates under the subject line **"Bingaman - Patty Restriction."** (Both emails: native DHS production, Exhibit P / Exhibit 22.) The subject line and routing show ODHS staff actively coordinating the restriction with the facility operator, not merely answering a question.

c. The same day, a multi-party telephone call took place among co-guardians' attorney Wyatt Baum, the co-guardians, their sister Cheryl Murchison (Russell's daughter and an objector in 23PR02271), Defendant Lenox, and Defendant Smith. Murchison, a participant, recorded it contemporaneously in her handwritten journal (produced at Bates 000112–000129; the July 10 entry at **Bates 000127;** Exhibit 6 to the Bakke Declaration), which states for that date, verbatim: **"7-10 phone call w/ Wyatt – S.A.C / Aaron – NN can lock door to keep Patty out / Erin Smith talked w/ Aaron + Tempie."** As a participant recording what she personally heard, Murchison recorded the entry contemporaneously in the guardian journal she kept.

22. Facility owner Defendant **Bartell later confirmed the state authorization under oath.** At the September 10, 2024 hearing on the motion to limit Patty's association with Russell

(23PR02271), Bartell testified, verbatim (Tr. of Sept. 10, 2024 hearing, Union County Circuit Court No. 23PR02271):

**"My licensing, adult foster home licensing, they gave us permission to follow what the guardians were requesting to keep Patty out of the inside of the facility."**

She further testified, verbatim: **"And I had to wait until licensing approved that order."** (Id.) And: **"That's when we were able to lock the doors and there were no more issues with her coming in."** (Id.) These sworn admissions — that ODHS/APD licensing "gave us permission" and that the facility "had to wait until licensing approved that order" — are direct evidence that the state defendants authorized and directed the exclusion, making the private defendants' conduct joint action under color of state law.

23. On **2024-07-12**, Patty and registered nurse **Selina Shaffer** were locked out of the facility. Plaintiff Bakke's filed declaration states, verbatim: **"On July 12, 2024, Patricia Bingaman arrived at Nadine's Nest carrying ironed shirts for her husband. The door was locked. A staff member opened it only wide enough to speak."** And, as the staff explained the lockout: **"Licensing is the one who told us we could lock it. I'm just doing my job. That's all."** (Declaration of Levi Bakke ¶ 5, filed in 26CV11493.)

24. Nurse Shaffer, a registered nurse of more than 30 years, was a percipient professional witness to the July 12 lockout. In her contemporaneous written account she states, verbatim: **"I was with Patty Bingaman on July 12, 2024, during an attempted visit to Russell Bingaman at Nadine's Nest Adult Foster Home. Upon arrival at the door to Nadine's Nest, we discovered the front door was locked. As a registered nurse, I have worked in home care settings, and I have never encountered a care facility with a locked front door."** She further states that a staff member **"stated she was not allowed to grant Patty Bingaman access into the home"**

and that **"[t]he caregiver was on the telephone the entire time of this discussion."** (Selina Shaffer letter, Oct. 9, 2024, filed as Exhibit 13 in 26CV11493.)

25. **The same day, Defendant Lenox affirmatively misrepresented the basis for the lockout to Patty and Nurse Shaffer.** Immediately after being turned away, Patty and Shaffer went to the APD office to report the lockout, where they met with Defendant Lenox and APS Specialist Eric Stone. Shaffer's contemporaneous account states, verbatim: **"At APD, we were greeted by Eric Stone and Aaron Lennox…. Mr. Lennox informed me that he had founded concerns supporting Russell's children and caregiver's allegations, and he had the 'policy analysts in Salem review the documents and he was validated that visit from Russell's wife, Patty could legally be restricted from entering the home'. Due to privacy rules, Mr. Lennox could not share the alleged allegations."** This was an affirmative misrepresentation: through Lenox, ODHS told Patty and her nurse that her exclusion was lawful and Salem-validated while withholding the basis — and did not disclose that ODHS staff had themselves coordinated the restriction two days earlier (¶ 21). The misrepresentation also prolonged the deprivation: believing the exclusion had been officially validated, Patty did not return to attempt further visits, as Shaffer observed — **"I am puzzled how Patty would assume on her own, that she could return to Nadine's Nest after the last encounter on July 12, 2024."** (Same source as ¶ 24.)

26. The exclusion continued for approximately **67 consecutive days**, from on or about 2024-07-05 until the **September 10, 2024 hearing** on the motion to limit association in Union County Case No. 23PR02271 — Patty remained banned until that hearing, and the ban's existence through that date was acknowledged on the record at the hearing. Hospice charting confirms the ban in force mid-window ("WIFE IS LEGALLY BANNED FROM SEEING PATIENT," Aug.

2024), and the first charted visit thereafter is September 16, 2024, under the new 30-minute regime. Throughout the exclusion, Patty was denied all visitation and companionship with her husband. No court order barred Patty's visits at any time during the exclusion. Her first permitted visits back came only in mid-September 2024, under an order limiting her, verbatim, "to one visit, one time per week . . . no longer than 30 minutes" — with a single exception the order itself had to grant: "a 2-hour visit on her and Russell Bingaman's anniversary, September 19th," the couple's 58th. On her first visit back, September 13, 2024 — the day after the bench ruling — Russell was so heavily medicated he could barely lift his head; the facility's house manager later described that visit in a recorded interview, photographs in hand: "So this is what they told me to do. This was your visit on the 13th when she came back. This is how medicated he was." Hospice charting recorded the next visit: Russell "BECAME TEARY EYED, ACCEPTED A KISS FROM WIFE AFTER 2ND ATTEMPT" (Sept. 16, 2024).

## C. Concealment: DHS hid its authorization while Patty kept pleading

27. Throughout July, August, and into September 2024, Patty repeatedly contacted DHS and pleaded to be allowed to see Russell. At no time during the lockout did any state defendant disclose to Patty that DHS itself had authorized the facility to lock her out. Neither Patty nor Plaintiff Bakke possessed the Murchison guardian journal (Exhibit 6) or the underlying DHS communications during 2024 or the first quarter of 2025. Plaintiffs first obtained the guardian journal **on or about April 4, 2025**, in the records productions received that spring (Plaintiff Bakke's April 4, 2025 email contemporaneously documents receipt of "about 1700 pages of hospice documents"; the journal pages carry discovery-production Bates 000112-000129); at the latest, possession is established by May 29, 2025. Before April 2025, no filing or communication by Plaintiffs quotes or references the July 10 "NN can lock door to keep Patty out" entry.

28. On **October 10, 2024**, Patty hand-delivered Nurse Shaffer's written account (¶¶ 24-25) into Defendant Lenox's hands at an APD meeting. Lenox's own email confirms the meeting and its attendees. ODHS nonetheless produced **no record** of that meeting, no notes, and no copy of the Shaffer letter in response to Patty's records requests.

29. Russell H. Bingaman died on **2025-01-29**, having been denied his wife's companionship during the lockout.

**D. Facts specific to Count III: the records war against Plaintiff Bakke**

30. Beginning in 2024 and continuing through 2026, Plaintiff Bakke — an investigative journalist publishing under Valor Investigates — investigated and published reporting on the conduct described above, submitted public records requests to ODHS, and petitioned the Oregon Attorney General and the courts. This reporting, requesting, and petitioning is constitutionally protected activity under the First Amendment.

31. **ODHS monitored Bakke's journalism and logged internal referrals about it.** ODHS's own records log (produced in response to public records request LMYK95L, production p. 16) states, in an entry by ODHS employee Norton dated **2025-08-21**, that **"the local office has seen Valor Investigations (Levi Bakke) posting on social media (Facebook) and his website"** and that **"We have submitted a couple ROSE referrals regarding what the investigator has published"** — naming the same local officials (Lenox, Smith) whose conduct Bakke's reporting criticized. The referral records Norton admitted submitting remain unproduced: when ODHS produced its ROSE log on July 15, 2026, approximately 72 of its roughly 111 narrative entries were fully redacted, with no redaction log, and no entry is identifiable as the admitted referrals about Bakke's publications. A second entry by ODHS employee Bambusch dated **2026-02-02** logs Bakke as **"an Investigative Journalist and has made contact with the Governor's office and Oregon Senator Gelser-Blouin."**

32. **The certified appeal ODHS swore it never received.** On **2025-03-17**, Bakke's approximately 300-page certified-mail appeal package (USPS tracking no. 9510 8152 5368 5073 2624 39) was delivered to ODHS headquarters at 500 Summer Street NE, Salem, where it was signed for by **Raymond Berg**, a mail delivery driver for the Oregon Department of Administrative Services' Postal and Distribution Services — which, as DAS has confirmed in writing, "is the authorized receiving agent for ODHS per the agenc[y's] request," and which leaves signed-for items in the ODHS headquarters mailroom and photographs them there. ODHS later certified in writing that the appeal was "never received." After ODHS's denials, Bakke obtained from DAS by public records request (DAS Reference R000752-032026, productions of April 20 and 24, 2026) the delivery record for that tracking number and DAS's photograph of the delivered appeal package inside ODHS headquarters.

33. **The standing denial.** On **2025-09-26 at 4:22 PM**, the ODHS records unit (dhs.recordsrequest@odhsoha.oregon.gov) wrote to Bakke, verbatim, that **"a formal appeal or petition reconsideration was never received and Mr. Bakke does not have any appeal rights if he were to submit one."**

34. **Defendant Kenney's sworn adoption.** On **2026-03-19**, Defendant Kenney — declaring **"I am the manager of the Public Records Unit (PRU) of the Oregon Department of Human Services"** — swore a declaration in Bakke v. ODHS (26CV11493) adopting ODHS's December 19, 2025 response and its certifications, including that **"ODHS has fulfilled Mr. Bakke['s]"** requests and that no responsive text messages were found. Four filed exhibits prove the text-message certification false: Exhibit 15 (Smith email forwarding a text message to Lenox), Exhibit 16 (Smith text messages, 10 pages), Exhibit 17 (Stone text messages, 7 pages), and Exhibit 5 (the DHS contact log's own "Text message" entry). Her declaration was signed under

penalty of perjury: **"I understand it is made for use as evidence in court and is subject to penalty for perjury."**

35. **The Attorney General's April 10, 2026 Final Order rests on Kenney's representations.** The order (DOJ File 100301-GA0068-26) records that **"We contacted Mallory Kenney, ODHS Public Records Unit Manager, regarding your petition,"** that **"Ms. Kenney indicated that the responsive reports were provided,"** and that the order had **"no reason to doubt the representation of Ms. Kenney that the records are not in ODHS's possession"** — the operative basis for denial (Issues B and C), including the certification that **"ODHS has no responsive records to this request as staff never received any appeal documents"** — a certification contradicted by the signed delivery record and DAS photograph (¶ 32). The order further records (Issue J) that **"ODHS produced a different and larger set of records to another records requester, Patricia Bingaman,"** while withholding records from Bakke. (Plaintiffs plead Issue J as differential treatment of the journalist requester; the AG separately concluded the other requester was lawfully entitled to the records she received.)

36. **Injury and chill.** Kenney's false certifications and the denials built on them deprived Bakke of records at the center of his reporting and of his petitioning (including the ROSE referral records about his own journalism, still unproduced, ¶ 31), imposed the costs of repeated administrative petitions and litigation, and would chill a person of ordinary firmness from continuing to report on and petition about ODHS's conduct. Bakke's related court access had already been cut off in state court: on April 18, 2025, the court in 23PR02271 ordered, verbatim, that **"the clerk of the Court is hereby ordered to reject any future filings by Mr. Bakke in this case as he lacks standing"** (Opinion and Order, 4/18/2025, 23PR02271; pleaded here as injury and context, not as a claim against any judicial officer).

## V. CLAIMS FOR RELIEF

**COUNT I — 42 U.S.C. § 1983: Fourteenth Amendment Substantive Due Process (Deprivation of Spousal Association and Companionship)**
**Plaintiff Patricia Bingaman v. Lenox, Smith, Bartell, and Nadine's Nest, LLC**

37. Plaintiff Patricia Bingaman realleges paragraphs 1-29.

38. A spouse has a constitutionally protected liberty interest in the companionship and society of her husband under the Due Process Clause of the Fourteenth Amendment. The Ninth Circuit has long protected the familial-association interests of immediate family members, *Hayes v. County of San Diego*, 736 F.3d 1223, 1229-30 (9th Cir. 2013); *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998), and has applied the same Fourteenth Amendment framework to a wife's claim for loss of her husband's society, *Byrd v. Guess*, 137 F.3d 1126, 1133-34 (9th Cir. 1998). Marriage sits at the core of the intimate relationships the Constitution protects, *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987) ("[t]he intimate relationships to which we have accorded constitutional protection include marriage"), and district courts in this Circuit have consistently recognized a spouse's substantive-due-process right to a husband's companionship, e.g., *Estate of Kevin Brown v. City of San Diego* (S.D. Cal. 2020); *Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1274 (E.D. Cal. 2012). Plaintiffs acknowledge that *Peck v. Montoya*, 47 F.4th 1056 (9th Cir. 2022), reserved whether a spousal familial-association claim may be asserted, but Peck resolved only a fast-moving police shooting under the purpose-to-harm standard and expressly did not hold the right does not exist. This case — a deliberate, weeks-long, administratively coordinated total exclusion of a wife from her dying husband — presents the direct interference Peck reserved, and the right arises from the same familial core this Court has protected since *Moreland*. The same interest is protected as intimate association under the First Amendment: marriage is among "[t]he intimate

relationships to which we have accorded constitutional protection," *Rotary Club*, 481 U.S. at 545, and this Court recognizes familial association under the First Amendment, *Lee v. City of Los Angeles*, 250 F.3d 668, 685-86 (9th Cir. 2001); *Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018).

39. Defendants Lenox and Smith, acting under color of state law, authorized and directed an approximately 67-day exclusion of Patty from all contact with her husband, deliberately depriving her of that liberty interest without justification — contrary to ODHS's own prior determination that the earlier IBL "was in violation of the Individual Based Limitations rules" and that "no restrictions on visitation will be initiated" (¶ 16). Defendants' conduct shocks the conscience under the deliberate-indifference standard. Because the exclusion was planned and coordinated over days and weeks — through the July 2 draft IBL, the July 10 "Bingaman - Patty Restriction" emails and multi-party telephone call, and the July 12 Salem-validation misrepresentation — "actual deliberation [was] practical," and deliberate indifference to the harm caused suffices. *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013); *Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008); *Peck v. Montoya*, 47 F.4th 1056 (9th Cir. 2022); see *County of Sacramento v. Lewis*, 523 U.S. 833, 846-50 (1998). The purpose-to-harm standard reserved for repeated split-second decisions has no application to a sixty-seven-day administrative exclusion. Defendants knew the exclusion would deprive Patty of her husband's society during his final illness and proceeded anyway, contrary to ODHS's own prior determination (¶ 16).

40. Defendants Bartell and Nadine's Nest, LLC are liable under § 1983 as willful joint participants with the state actors: they acted pursuant to and in concert with the state authorization ("Aaron – NN can lock door to keep Patty out," ¶ 21; "My licensing, adult foster

home licensing, they gave us permission to follow what the guardians were requesting to keep Patty out of the inside of the facility," and "I had to wait until licensing approved that order," ¶ 22), making their conduct fairly attributable to the State. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982); *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). As private parties, Defendants Bartell and Nadine's Nest, LLC are not entitled to qualified immunity. *Wyatt v. Cole*, 504 U.S. 158, 161-69 (1992); *Richardson v. McKnight*, 521 U.S. 399 (1997).

41. **Continuing joint action.** The state and private defendants agreed and acted in concert to exclude Patty, and each of the approximately 67 consecutive days of blocked visitation was an overt act in furtherance of that agreement. Because the state defendants remained parties to the ongoing joint exclusion, each blocked visit after July 10, 2024 is an act for which Lenox and Smith are liable, so long as any such overt act falls within the limitations period measured from the filing date. *Dennis v. Sparks*, 449 U.S. at 27-28. The right at issue was clearly established in July through September 2024. It has long been beyond debate in this Circuit that state officials may not deliberately sever an immediate family relationship without justification or process: familial-association rights were clearly established for these purposes in *Moreland* (1998), *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000), *Hayes* (2013), and *Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018), the last denying qualified immunity to a social-services official who separated a mother and child without imminent danger. Marriage has occupied the core of constitutionally protected intimate association since *Rotary Club*, 481 U.S. at 545. Even were no case factually identical, the unlawfulness was obvious: no reasonable official could believe that authorizing a total, court-order-less, sixty-seven-day exclusion of a wife from her dying husband — contrary to the agency's own determination that such restrictions violate its rules — was lawful. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

42. As a direct and proximate result, Patty suffered the loss of her husband's companionship during the final months of his life, emotional distress, and other injuries.

**COUNT II — 42 U.S.C. § 1983: Fourteenth Amendment Procedural Due Process**
**Plaintiff Patricia Bingaman v. Lenox, Smith, Bartell, and Nadine's Nest, LLC**

43. Plaintiff Patricia Bingaman realleges paragraphs 1-29.

44. The liberty interest of which Patty was deprived is her constitutionally protected right of intimate association with her husband — an interest arising from the Fourteenth Amendment itself, not from any state statute. The exclusion was imposed without any notice, hearing, or process, and contrary to ODHS's own prior determination (¶ 16) and the Family Agreement (¶ 17). No court order barred Patty's visits. As Nurse Shaffer's contemporaneous account confirms, Patty was told only later — "in September, during the court hearing discussing the family plan related to Russell's care, that she could have visited Russell after the July 12, 2024, event" — underscoring that the approximately 67-day exclusion rested on no valid legal authority and no process at all. Patty received no opportunity to be heard before or during the deprivation of her protected interest. See *Mathews v. Eldridge*, 424 U.S. 319 (1976).

45. **Oregon law confirms what process was due and that it was skipped.** Under ORS 125.323(2), a guardian "may not limit a protected person's preferred associations, except: (a) As specifically allowed by the court; or (b) To the extent the guardian determines necessary to avoid unreasonable harm to the protected person's health, safety or well-being." "Association" means "communication, visitation or other social interaction with third parties." ORS 125.323(1)(a). When a guardian limits association under the (b) exception, an interested person may move the court to modify the guardian's powers, and the court must hold a hearing. ORS 125.323(4); ORS 125.080(3). Here, no court order specifically allowed the exclusion, and the necessity exception cannot support a sustained total lockout of approximately 67 days given ODHS's own SOQ

finding (¶ 16) and the Family Agreement (¶ 17). Critically, this limited, court-supervised authority belongs to the guardian, not to ODHS: nothing in ORS 125.323 or elsewhere gives ODHS licensing authority to "validate" a restriction on a spouse's association. Plaintiff does not plead ORS 125.323 as the source of her liberty interest; she pleads it to show that Oregon channels any restriction of a protected person's associations through the probate court — the very process Defendants bypassed. The state defendants nonetheless purported to validate and authorize the lockout (¶¶ 21, 22, 25) with no court order and no process, depriving Patty of the court proceeding Oregon law provides.

46. Defendants, acting under color of law and in joint action, deprived Patty of procedural due process, proximately causing her injury. The process obligation Defendants bypassed was clearly established in 2024: it has been beyond debate since *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970), and *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976), that the State must afford notice and a meaningful opportunity to be heard before finally depriving a protected liberty interest — and no reasonable official could believe that a sixty-seven-day, court-order-less total exclusion of a wife from her dying husband required no process at all.

## COUNT III — 42 U.S.C. § 1983: First Amendment Retaliation
## Plaintiff Levi Bakke v. Kenney

47. Plaintiff Levi Bakke realleges paragraphs 1-4, 6, 11, and 30-36. This count arises from the same series of transactions as Counts I and II: the records Bakke's requests sought — and that the certifications at issue suppressed — are the records of the very lockout and its concealed state authorization pleaded above, including the July 10, 2024 "Bingaman - Patty Restriction" communications and the ROSE referral records (¶¶ 21, 27-28, 31), and common questions of fact concerning ODHS's handling and concealment of those records run through all three counts.

48. To state a First Amendment retaliation claim, a plaintiff must plausibly allege "that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Capp v. County of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (quoting *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016)).

49. **Protected activity.** Bakke's investigative journalism, his public records requests, and his petitions to the Attorney General and the courts (¶ 30) are protected by the First Amendment's Speech, Press, and Petition Clauses. Bakke does not assert a freestanding constitutional right of access to government records, see *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978); his claim is that Defendant Kenney retaliated against him **because of** his protected activity, through knowingly false certifications and the denials built on them.

50. **Adverse action.** Kenney's sworn adoption of the false "no records"/"never received" certifications (¶¶ 32-34) — contradicted by the signed receipt of ODHS's designated receiving agent, by DAS's photograph of the package inside ODHS headquarters, and by four filed exhibits — and the resulting denial of his petitions (¶ 35) would chill a person of ordinary firmness from continuing to report on and petition about ODHS. The chill inquiry is objective; it does not require that Bakke himself was silenced. *Capp*, 940 F.3d at 1053-54; *O'Brien*, 818 F.3d at 932-33.

51. **Causation / motive (pleaded on circumstantial evidence).** The retaliatory motive is pleaded on: (a) ODHS's own log entries admitting the agency monitored Bakke's journalism and filed internal referrals "regarding what the investigator has published," naming the officials his reporting criticized (¶ 31); (b) the knowing falsity of the certifications Kenney adopted under

oath — "never received" against the signed receipt of ODHS's designated receiving agent (¶ 32), "no responsive text messages" against four filed exhibits of texts (¶¶ 32, 34) — falsity from which retaliatory purpose may be inferred; (c) Kenney's knowledge that Bakke is a journalist-petitioner (¶¶ 31, 35); and (d) the differential treatment of Bakke relative to another requester (¶ 35). Plaintiff anticipates discovery of the withheld ROSE referral records and internal communications will further evidence motive.

52. **Clearly established.** It has long been clearly established in this Circuit that a government official may not take retaliatory action against an individual because of protected speech, even where the official's action would otherwise be within her authority. *Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013) (right "to be free from police action motivated by retaliatory animus, even if probable cause existed"); *Skoog v. County of Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006); *Capp*, 940 F.3d at 1053-56 (First Amendment retaliation claim stated against an individual state official on circumstantial motive allegations). No reasonable public records officer could believe that swearing to knowingly false certifications to defeat a journalist's petitions was lawful. The adverse action here is not a bare retaliatory investigation, cf. *Moore v. Garnand*, 83 F.4th 743 (9th Cir. 2023); it is a records custodian's personal, sworn adoption of certifications she knew were false — "never received" against the signed delivery receipt of ODHS's designated receiving agent, "no responsive text messages" against four filed exhibits — used to defeat Bakke's appeals and petitions, and on which the Attorney General's Final Order expressly relied. An official who personally attests to facts under oath acts as a complaining witness and receives no immunity for false swearing, *Kalina v. Fletcher*, 522 U.S. 118, 129-30 (1997), and it was beyond debate in 2025-2026 that a public official may not weaponize her office against a journalist's and petitioner's protected activity, *Ford v. City of Yakima*, 706 F.3d

1188, 1193 (9th Cir. 2013); *Skoog v. County of Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006); *CarePartners LLC v. Lashway*, 545 F.3d 867 (9th Cir. 2008) (licensing officials denied qualified immunity for retaliating against a regulated party's petitioning and criticism).

53. As a direct and proximate result, Bakke suffered the deprivation of his First Amendment rights, out-of-pocket petition and litigation costs, and injury to his journalistic work.

### VI. TIMELINESS (pleaded affirmatively)

54. Plaintiffs plead timeliness affirmatively, in layered alternatives. Section 1983 claims in Oregon borrow the two-year personal-injury limitations period of ORS 12.110(1). *Sain v. City of Bend*, 309 F.3d 1134, 1136-40 (9th Cir. 2002). Federal law governs accrual: "a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999); accord *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (accrual is a federal question; a claim accrues when the plaintiff has "a complete and present cause of action"). Any one of the following independent bases makes Counts I and II timely as of the date of filing. Count III's acts occurred in 2025-2026 and are timely without resort to tolling; each retaliatory act accrues separately.

55. **First basis — continuing deprivation accruing at its termination.** The approximately 67-day exclusion was a single continuing deprivation of Patty's associational liberty, analogous to false imprisonment: for such continuing torts, "the statute of limitations begins to run when the alleged false imprisonment ends." *Wallace v. Kato*, 549 U.S. 384, 391 (2007) (citing 4 Restatement (Second) of Torts § 899, Comment c). The exclusion ended at the September 10, 2024 hearing; the limitations clock therefore runs from that date, and Counts I and II are timely if filed on or before September 10, 2026, without resort to tolling.

56. **Second basis — fraudulent concealment / equitable estoppel (active misrepresentation).** This is not a case of mere silence. On July 12, 2024, Defendant Lenox affirmatively represented

to Patty and Nurse Shaffer that a Salem policy analyst had validated the restriction as lawful and that the basis could not be disclosed on privacy grounds (¶ 25), while ODHS staff had in fact coordinated the restriction internally two days earlier under the subject line "Bingaman - Patty Restriction" (¶ 21). Defendant Lenox's July 12, 2024 statement to Patty and Nurse Shaffer — that "policy analysts in Salem" had "validated" the restriction, while withholding the basis and never disclosing that ODHS staff had themselves coordinated the restriction two days earlier (¶ 25) — was an affirmative act of concealment on which Patty reasonably relied: believing the exclusion officially validated, she did not return or sue. That affirmative misrepresentation and concealment tolls the limitations period, and estops Defendants from asserting it, until Plaintiffs discovered the concealed facts on or about April 4, 2025. *Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010). The July 12 statement was "affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415-16 (9th Cir. 1987) (quoting *Gibson v. United States*, 781 F.2d 1334, 1345 (9th Cir. 1986)). It was also conduct "above and beyond the wrongdoing upon which [the] claim is filed," *Coppinger-Martin*, 627 F.3d at 750: the claim is the exclusion itself; the July 12 statement was a distinct act of concealment that misrepresented the exclusion's legal basis and concealed its state authorship. Patty pleaded with DHS throughout the exclusion (¶ 27), and neither she nor Plaintiff Bakke could, with reasonable diligence, have discovered the concealed authorization before the April 2025 productions (¶ 27).

57. **Third basis — discrete-act accrual in the further alternative.** Each day of the exclusion was renewed by affirmative acts — the locked door, the refused visit, the staffed enforcement of the ban (¶¶ 23-26) — each a discrete act with its own two-year clock. *Nat'l R.R. Passenger Corp.*

*v. Morgan,* 536 U.S. 101, 110-14 (2002). Every blocked day from 2024-07-05 through 2024-09-10 that falls within two years before the filing date is independently actionable; earlier blocked days remain admissible as background evidence. *Id.* at 113.

58. **Fourth basis — discovery accrual in the further alternative.** To the extent any claim component is held to have accrued only upon discovery of the concealed state authorization pleaded in ¶¶ 21-22, 25, that discovery occurred on or about April 4, 2025 (and no later than May 29, 2025) (¶ 27), and every such component is timely if filed on or before April 4, 2027. *Wallace v. Kato,* 549 U.S. 384, 388 (2007).

59. **Anticipated inquiry-notice defense, and answer.** Plaintiffs anticipate Defendants will argue that Bartell's September 10, 2024 testimony (¶ 22) placed Patty on inquiry notice of state involvement, starting the clock that day. Even if the Court accepted that argument, the claims remain timely so long as the complaint is filed on or before September 10, 2026. In any event, Bartell's generalized reference to "licensing" — naming no official, no date, and no document — did not, as a matter of law, give Patty knowledge or reason to know of the specific, concealed authorization documented only in the later-produced Exhibit 6.

60. **What the September 2024 hearing revealed cabins any inquiry notice to the private actors.** At that hearing, Patty learned only that the restriction had been improper — that "she could have visited Russell after the July 12, 2024, event" (¶ 44) — i.e., that the facility had wrongly excluded her. She did not learn there, or at any time before the April 2025 records production, that ODHS had authorized and coordinated the lockout; that role remained concealed behind Lenox's "Salem-validated" misrepresentation. Accordingly, even if the September 2024 hearing triggered inquiry notice, it did so only as to the private defendants' wrongful exclusion

— not as to the state defendants' concealed authorization, for which discovery accrual and fraudulent-concealment tolling continue to govern.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request:

61. Compensatory damages in an amount to be proven at trial;

62. Punitive damages against the individual-capacity defendants for conduct in reckless or callous disregard of Plaintiffs' federally protected rights;

63. A declaration that Defendants' conduct violated Plaintiff Bingaman's rights under the Fourteenth Amendment and Plaintiff Bakke's rights under the First Amendment;

64. Costs, and attorney fees under 42 U.S.C. § 1988 to the extent recoverable.

65. Such other relief as the Court deems just.

## VIII. DEMAND FOR JURY TRIAL

66. Plaintiffs demand a trial by jury on all issues so triable. Fed. R. Civ. P. 38(b); LR 38-1.

DATED: ___July 26___, 2026

_Patricia Bingaman_

Patricia Bingaman, Plaintiff, Self-Represented
65883 McKennon Lane, P.O. Box 509, Imbler, OR 97841 / (541) 786-1402 /
rpbing48@gmail.com

_Levi Bakke_

Levi Bakke, Plaintiff, Self-Represented
501 C Avenue, La Grande, OR 97850 / (971) 303-4982 / levi@valorinvestigates.com